NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0637n.06
Filed: August 29, 2007

Case No. 06-6107

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

PartyLite Gifts, Inc.,                              :
                                                    :
    Plaintiff-Appellant,                           :      On Appeal From the United States
                                                    :      District Court for the Eastern District of
v.                                                  :      Tennessee at Knoxville
                                                    :
Swiss Colony Occasions a/k/a Access Ventures,       :
Inc., Swiss Colony, Inc., and Kathy Watkins,        :
                                                    :
    Defendants-Appellees.                          :


BEFORE: GIBBONS and SUTTON, Circuit Judges; BECKWITH, District Judge.[*]

    SANDRA S. BECKWITH, District Judge. PartyLite Gifts, Inc. appeals the district court's

denial of its motion for a preliminary injunction. PartyLite asserts claims against the Defendants

for misappropriation of trade secrets, breach of contract and fiduciary duty, tortious interference

with contract, and unfair competition, all grounded in Defendants' solicitation and alleged

recruitment of PartyLite's sales force. The district court concluded that PartyLite had not

established its entitlement to a preliminary injunction. We affirm.

I.

    PartyLite is a multi-level direct sales company that sells candles and home fragrance

--------

[*] The Honorable Sandra S. Beckwith, Chief Judge, United States District Court for the
Southern District of Ohio, sitting by designation.

products. PartyLite's independent contractor sales consultants sell company products at home parties. Individual PartyLite consultants can rise through company ranks by successfully recruiting new sales representatives, which entitles the recruiter to share in the commissions earned by their new recruits. Successful consultants can become team leaders, unit/senior unit leaders, group leaders, district leaders, and regional leaders, each with increasing levels of recruiting responsibilities and profit-sharing.

PartyLite promulgated a "Worldwide Code of Conduct" governing business practices, including compliance issues, conflicts of interest, insider trading, and company secrets and property. PartyLite required its senior sales consultants to certify yearly their understanding of and compliance with the Code's requirements. The Code's section on "Confidential Information" prohibits disclosure of confidential and proprietary company information to persons outside of PartyLite and prohibits any personal benefit derived from use of this information. The Code describes confidential and proprietary information to include employee, customer and vendor lists and information regarding customer requirements, preferences, business habits and plans. (J.A. 110-111)

Defendant Kathy Watkins started working for PartyLite in August 1990 as a Development Coordinator. Watkins held different positions over the years, eventually becoming the Director of Sales Development. PartyLite and Watkins did not have a written non-competition/non-solicitation contract, although Watkins had certified her familiarity with and adherence to the Code of Conduct. On February 21, 2006, Watkins gave PartyLite two weeks notice that she was leaving the company. PartyLite wrote her, reminding her of the Code's confidentiality obligations and stating that PartyLite's "customer, Leader, Regional Vice

Presidents and Consultant names and contact information, marketing plans and promotions" were confidential and proprietary information. (J.A. 70) After leaving PartyLite, Watkins became Senior Vice President of Sales for Access Ventures, Inc., doing business as Swiss Colony Occasions ("SCO").

SCO was established in 2005 to create a home party plan marketing company selling Swiss Colony products. SCO's product line includes dinnerware, food, and home decor items. Prior to SCO's formation, Swiss Colony products were sold at retail outlets and through catalogs. SCO's sales consultants, like PartyLite's, are independent contractors who are not prohibited from representing other direct sales companies. Both companies forbid their consultants to sell competitors' products at the same home parties at which the companies' goods are sold.

SCO also utilizes a "Bridge Agreement" which it describes as a recruiting tool designed to attract consultants with prior direct sales experience. These Agreements provide a short-term monthly payment to new sales consultants to offset any temporary loss of earnings caused by joining a new organization. If the consultant is successful in quickly establishing a "downline" sales force, the consultant can retain the initially assigned "bridge" sales level within SCO; if the consultant is unsuccessful, the bridge title and extra economic benefits cease. Watkins' reply affidavit states that PartyLite used such "bridge agreements" when she arrived at the company in 1990, a contention that PartyLite vigorously disputes.

A few weeks after Watkins left PartyLite, its assistant general counsel Renee Baruch wrote to Watkins. (J.A. 163-164) Baruch stated that PartyLite believed Watkins was contacting and recruiting PartyLite's leaders and consultants to encourage them to join SCO, in violation of Watkins' duties of confidentiality. Baruch insisted that Watkins cease and desist from any

communication with anyone Watkins knew from her PartyLite employment and threatened litigation if Watkins' conduct continued. Unsatisfied with Watkins' and SCO's response, PartyLite filed a complaint in the district court on May 9, 2006, followed a few days later by a motion for a preliminary injunction and expedited discovery. The district court set oral argument for July 10, 2006, and requested the parties to inform the court if an evidentiary hearing would be necessary. No additional evidence or testimony was presented to the court.

On August 15, 2006, the district court denied PartyLite's motion. The district court concluded that PartyLite had established only a very low likelihood of success on the merits of its misappropriation of trade secrets claim, because the evidence did not show that Watkins' personal knowledge of PartyLite sales consultants was a trade secret under Tennessee law. Regarding PartyLite's various common law claims premised upon Watkins' alleged misappropriation, the court concluded those claims were preempted by the Tennessee Uniform Trade Secrets Act. The court also rejected PartyLite's contention that SCO's Bridge Agreement amounted to predatory pricing and thus constituted unfair competition. The district court found that PartyLite established "a modest degree of irreparable harm overall," but balanced that against the low likelihood of success, the greater harm caused by imposing a preliminary injunction, and the public interest disfavoring injunctive relief. Weighing all four factors, the court denied PartyLite's motion. PartyLite timely appealed.

II.

When considering the district court's denial of a preliminary injunction, we review its legal conclusions *de novo*, and its ultimate conclusion for abuse of discretion. *McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 867 (2005). The district court's

factual findings "must be clearly erroneous in order for this court to find that it abused its discretion." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). The district court's "weighing and balancing of the equities of a particular case is overruled only in the rarest of cases." *Id.* (Internal citations and quotations omitted).

A district court may grant preliminary injunctive relief after considering and balancing four factors: (1) whether Plaintiff has demonstrated a strong likelihood of success on the merits; (2) whether Plaintiff would otherwise suffer irreparable injury; (3) whether the grant of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served. *McPherson v. Michigan High School Athl. Assn.*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

A.    Likelihood of Success on the Merits.

The district court correctly noted that this factor is ordinarily satisfied if the moving party ". . . raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1989) (internal citations omitted).

1.   Trade Secrets. The Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. §47-25-1701 et seq, recognizes a claim for misappropriation of trade secrets, which are defined as:

> [I]nformation, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily accessible by proper means by other persons who can obtain economic value from its disclosure or use; and

-5-

> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn.Code Ann. §47-25-1702(4). Several factors are relevant to determining whether information falls within this statutory definition, including the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders. *See generally*, *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001) (internal citations omitted).

PartyLite contends that Watkins misappropriated the names of its sales consultants, which PartyLite contends are trade secrets. While admitting that sales consultants' names were public knowledge (from business cards and individual agents' websites, for example), and that PartyLite would not want its sales consultants' identities to be a secret, PartyLite argued that the act of compiling information about its consultants over the years created a trade secret. As the district court phrased it, "In a sense, plaintiff is arguing that the whole of plaintiff's sales force information is worth more than the sum of its parts." The district court credited Watkins' affidavit that she used only her personal knowledge of individual sales consultants and relationships she had developed while at PartyLite. The district court concluded that this information was likely not a trade secret, as under Tennessee law an employee's "remembered information" and relationships with customers are not trade secrets. *B&L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 215 (Tenn. Ct. App. 2004).

PartyLite argues here that the district court erroneously credited Watkins' declaration without adequately considering its own evidentiary declarations. PartyLite also argues that the

TUTSA's definition of trade secrets is broader than the common law test and that the district court should not have relied on pre-TUTSA cases to conclude that Watkins' knowledge was not a trade secret. And, PartyLite contends that "misappropriation" is broader than mere "use" and that the district court erred in considering only the information Watkins admitted she was "using" without adequately considering her misappropriation of the names in the first instance.

We first note that PartyLite overstates the "conclusive" or "unrebutted" character of its own witness declarations. For example, Amy Mullen (who worked briefly at SCO with Watkins) states she saw Watkins "display" a notebook filled with names and information about "hundreds" of PartyLite salespeople. She also states that Watkins told SCO that it must do business in Texas because Watkins had lots of names in that state. Mullen disapproved of recruiting sales consultants from other direct sales companies; she was unhappy with the direction SCO had chosen, and she left the company shortly after Watkins arrived. Mullen does not specifically describe the "notebook" in question, and Watkins denies taking or creating any "master list" from PartyLite. Mullen also admits that she did not see any list of PartyLite consultants to whom Watkins sent gifts, in an effort to recruit them to SCO. The district court's credibility assessment of the competing declarations, and its decision to credit Watkins' statements, is not clearly erroneous.

PartyLite also submitted declarations from several of its sales consultants. Elisa Froehling asserts that she received an unsolicited gift from Watkins (a package of SCO products), even though she did not have regular contact with Watkins. But Froehling also admits that she "worked closely" with Watkins on some occasions. Llonda Putz, who also received some contact from Watkins, states that she had prior "dealings" with Watkins about her

own downline sales force.  These declarations do not clearly establish that Watkins was improperly using confidential information, because both women admitted knowing and working with Watkins before she left the company.  Gerri Pletcher, who also received a gift package, states she had not seen Watkins for several years, and that the package had been sent to an address where she had not lived for more than six years.  The district court did not specifically refer to this declaration; but the fact that Watkins used an outdated address supports her contention that the information she used was based on her personal experience, and not misappropriation of PartyLite's records before her departure.

The evidence before the district court regarding the efforts to maintain the secrecy of the information demonstrates that PartyLite publishes a monthly magazine called "Reflections," which is sent to its 30,000 consultants.  The January 2006 issue contains list after list of consultant names, rank in the company, and their sales figures.  Lists of top sellers in various categories (e.g., team, unit, district and regional leaders) as well as the names of newly qualified consultants are published.  (J.A. 294-361)  There is nothing in the magazine indicating that any of this information is confidential or proprietary; SCO obtained several copies on e-Bay.  SCO also submitted the results of an internet web search, conducted prior to the preliminary injunction hearing, which produced the names of over 300 PartyLite sales consultants and their individual web sites.  PartyLite discounts all of this evidence, contending that ex-PartyLite consultants improperly sold their materials on e-Bay and that the web sites would not yield information about consultants' sales volume or downline recruiting successes.  PartyLite also notes that confidential information can be a trade secret  even when independent research would yield the same information, if that research would be "difficult, costly, or time consuming." *See Wright Med.*

*Tech.*, 135 S.W.3d at 589.

Given the apparent widespread distribution of the PartyLite magazine and lack of any confidentiality protections noted on it, combined with the relative ease in locating sales consultants via web searches, we cannot say the district court abused its discretion in concluding the names are not a trade secret.

PartyLite also contends that the district court erroneously concluded that the Tennessee trade secrets statute did not completely pre-empt common law concerning the definition of a "trade secret." PartyLite argued that the statute completely pre-empts the entire trade secrets field; the district court disagreed, noting the statute itself expressly pre-empts only conflicting civil remedies for trade secret misappropriation. *See* Tenn. Code Ann. §47-25-1708(a). Pre-statute cases that consider the factors listed in the statute's definition of "trade secret" are not invalid simply by virtue of the statute's passage. We thus need not consider PartyLite's invitation to overrule portions of *Stratienko v. Cordis Corp.*, 429 F.3d 592 (6th Cir. 2005), an invitation we have no power to accept in any event.

PartyLite cites *Princess House, Inc. v. Lindsey*, 77 F.3d 486 (8th Cir. 1996) (unpublished table decision), which affirmed a district court's issuance of a permanent injunction against two former sales consultants for Princess House, a multi-level direct sales company. The district court had enjoined the Lindseys from using confidential information and recruiting Princess House salespeople. The Eighth Circuit's opinion provides no facts about the specific relationship between Lindsey and Princess House, but often refers to a "contract" between those parties. The opinion is not helpful due to the paucity of facts provided, particularly in light of the absence of a non-solicitation agreement between PartyLite and Watkins. The result in that case might apply

here if the parties had a valid non-solicitation agreement, but it appears to have no applicability to the instant case.

PartyLite also suggests that the district court erred in denying injunctive relief based solely on the documentary evidence and before any discovery. The district court's minute order of June 23, 2006 plainly states that the court was willing to set an evidentiary hearing if the parties desired to present testimony. PartyLite waived that opportunity and told the court it would not present witnesses. It cannot complain here that the district court did not consider additional evidence that PartyLite chose not to present.

Finally, we reject PartyLite's contention that the district court did not adequately consider whether Watkins "misappropriated" any information. The district court obviously concluded that the names of the sales consultants was not a trade secret; therefore, Watkins' possession and use of the information would not support a claim of misappropriation. The district court specifically stated its view that knowledge of the identities of particular salespeople has only marginal economic value and that PartyLite does not conceal those identities for its own obvious economic reasons. Sales consultants can be readily located through easily available public means. The district court also left open the possibility that, as discovery proceeds in the case, PartyLite's arguments may gain more force, but on the record presented, the district court could not conclude that PartyLite had a likelihood of success of establishing that the names were a trade secret. We affirm the district court's ultimate conclusion, because on our review of the record, we are not left with the "definite and firm conviction that the trial court committed a clear error of judgment." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000).

2.    Tortious Interference with Contract.

The district court concluded that PartyLite did not establish a likelihood of success on this claim because it was premised on the allegation that Watkins' information about PartyLite's sales consultants was a trade secret. As we affirm the district court's conclusion on the issue of trade secret, we also affirm its conclusion on this claim. PartyLite suggests that it need not establish misappropriation of trade secrets in order to establish a tortious interference claim, noting that "several" PartyLite leaders have submitted their resignations, presumably to sell for SCO. The record before the district court supports the conclusion that PartyLite did not establish the requisite likelihood of success on the merits on this claim. PartyLite consultants are essentially at-will contractors, and they are not forbidden from selling other types of products for other direct sales companies. Moreover, one element of a tortious interference claim is evidence that the defendant acted maliciously, with an improper motive or means. *See Hauck Mfg. v. Astec Indus.*, 375 F.Supp.2d 649, 659 (E.D. Tenn. 2004). PartyLite's argument that Watkins and/or SCO acted with improper means is clearly premised upon the alleged trade secrets misappropriation. Given our affirmance of the district court on that issue, the same result is properly applied to this claim.

3.    Breach of Contract/Fiduciary Duty Claims.

The district court concluded these claims were pre-empted by the TUTSA. PartyLite has not appealed this portion of the district court's order; hence we need not address these claims.

4.    Unfair Competition/Tortious Interference.

The district court found that these claims were pre-empted by TUTSA to the extent the claims rest on PartyLite's trade secrets allegation. We agree with this conclusion. The district

court relied on *Hauck Mfg.*, which exhaustively surveyed state cases concerning the pre-emptive effects of the Uniform Trade Secrets Act, and concluded that the statute pre-empted all common law or other claims that would succeed or fail dependent upon proof of improper use of trade secrets. *Id*. at 658. The same conclusion was reached in *Vincit Enterprises v. Zimmerman,* 2006 U.S. Dist. LEXIS 32323 (E.D. Tenn., May 12, 2006), and *ATCO Manufacturing Co. v. Share Corp.*, 2007 U.S. Dist. LEXIS 37503 (E.D. Tenn., May 22, 2007). As we noted in *Stratienko v. Cordis Corp.*, 429 .3d 592, 600 (6th Cir. 2005), "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." Given the well-reasoned *Hauck* decision, and the absence of any contrary authority from the Tennessee courts, the district court reasonably concluded these claims were pre-empted.

The district court also rejected PartyLite's predatory pricing argument with respect to SCO's Bridge Agreements. PartyLite claims these agreements "unfairly" grant advanced status in the SCO hierarchy based upon the consultant's PartyLite status and pay more than is justified by actual sales results. The district court, noting that PartyLite offered no legal support for its predatory pricing/unfair competition claim, concluded PartyLite had not shown a likelihood of success. We agree. PartyLite's arguments about the agreements' "unfairness" is based on its own CEO's opinions. In the absence of any factual data supporting those opinions and any compelling legal support for the theory, the district court clearly did not err in concluding that PartyLite had not established a likelihood of success on the merits of this claim for purposes of injunctive relief.

B. Irreparable Harm.

The district court, assuming *arguendo* that Watkins used PartyLite's trade secrets,

-12-

concluded PartyLite had shown "a modest degree of irreparable harm overall." (J.A. 53) PartyLite argues that the district court improperly balanced this irreparable harm with the court's assessment of the merits of PartyLite's trade secrets arguments. We reject PartyLite's contention because it is clear that the district court found that Watkins and SCO were not using trade secrets. In view of that finding, the district court's balancing of the "modest" irreparable harm with the high unlikelihood of success on the claims was not an abuse of discretion.

C.      Harm to Others.

The district court balanced the harm that PartyLite asserted was caused to its own sales consultants (loss of income) with the harm of forbidding Watkins and SCO from soliciting those sales consultants. The court concluded that greater harm would result from the restraint on competition, especially in view of the fact that PartyLite's sales consultants are independent contractors and not employees. We cannot conclude that the court's conclusion was an abuse of discretion.

D.      Public Interest.

Finally, the district court balanced the competing public interests of protecting contracts and disfavoring restraints of trade and concluded that the former could be protected in the absence of injunctive relief. The court found the public interest did not favor an injunction, a conclusion well within the district court's ample discretion.

IV.

For all of the foregoing reasons, we affirm the district court's denial of PartyLite's motion for a preliminary injunction.