NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0429n.06

Case No. 23-1410

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>CHEETAH MINER USA, INC.,<br><br>    Plaintiff-Appellee,<br><br>v.<br><br>19200 GLENDALE, LLC,<br><br>    Defendant-Appellant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN<br><br>OPINION</td></tr>
</table>

FILED
Oct 10, 2023
DEBORAH S. HUNT, Clerk

Before: MOORE, READLER, and MURPHY, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Cheetah Miner USA specializes in cryptomining, the validation of cryptocurrency (e.g., Bitcoin) transactions. Even in this modern business medium, however, the company is not immune from more traditional legal hurdles, namely, a dispute over its commercial lease. Cheetah Miner maintains that its landlord violated Michigan state law by cutting off electric power to the leased property. To remedy the issue, Cheetah Miner sought a preliminary injunction requiring its landlord to restore power to the property. The district court denied that request. Because Cheetah Miner has not established irreparable harm, a necessary showing in the quest for preliminary relief, we affirm.

## I.

19200 Glendale LLC owns a large industrial building on the west side of Detroit. Cheetah Miner agreed to lease space in the building for a term of 60 months. The lease contemplated that Cheetah Miner would use the premises for "crypto currency mining equipment for the verification

and production of Bitcoin." Despite these promising beginnings, tensions soon arose between the parties, so much so that, less than a year into the arrangement, the two began discussing terminating the lease. At that point, 19200 Glendale allegedly "cut off . . . electrical service by moving" its lessee's electrical account to its own name.

Ten days passed without any electricity. Then, Miranda Tan, Cheetah Miner's CEO, sent an email to 19200 Glendale's manager inquiring about the status of the lease termination. After mentioning that "the power is off for our machines," Tan asked whether 19200 Glendale could "turn the power on . . . so we can keep mining [until] we finalize the lease termination." 19200 Glendale apparently never responded to the email. Another ten days later, Tan followed up. In this second email, she again expressed interest in "mov[ing] forward on the lease termination" and reiterated that "[19200 Glendale] turned off our power." Again, no response by 19200 Glendale was forthcoming.

A few days later, Cheetah Miner's lawyer contacted 19200 Glendale to reignite discussions over terminating the lease. But just as those renewed conversations got underway, Cheetah Miner "fell silent." And it stayed so until it filed this action against 19200 Glendale roughly two months after Cheetah Miner's electric problems began.

Invoking the district court's diversity jurisdiction, *see* 28 U.S.C. § 1332, Cheetah Miner alleged that 19200 Glendale had left the company with insufficient electrical capacity to operate its mining operation. That conduct, Cheetah Miner asserted, violated Michigan's Anti-Lockout Statute—a state law creating a cause of action for tenants whose possessory interests have been "unlawfully interfered" with by the landlord. *See* M.C.L. § 600.2918(2). Cheetah Miner also contended that its landlord had breached the terms of the lease. According to Cheetah Miner's complaint, this collection of misconduct resulted in damages in the form of "lost profits."

Along with its complaint, Cheetah Miner filed an emergency motion, invoking the Anti-Lockout Statute. In its motion, Cheetah Miner sought a preliminary injunction to "immediately restore the same level of electric service as existed when [the company] took possession of the premises." After briefing and a hearing, the district court denied Cheetah Miner's motion. As the district court saw things, Cheetah Miner was unlikely to succeed on the merits of its claims and, in addition, had failed to establish any irreparable harm. The next day, Cheetah Miner filed an interlocutory appeal of the denial of its preliminary injunction motion. *See* 28 U.S.C. § 1292(a).

## II.

**A.** We review a district court's decision denying a preliminary injunction for an abuse of discretion, considering any embedded legal questions de novo and any factual findings for clear error. *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014). Although the parties agree on the standard of review, they part ways over what framework should have guided the district court's assessment of whether injunctive relief was appropriate. 19200 Glendale invokes the familiar four-part test—likelihood of success on the merits, irreparable harm, the balance of the equities, and the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Cheetah Miner has other ideas. Michigan's Anti-Lockout Statute, the company notes, affords wronged tenants the right to "recover possession." Accordingly, says the cryptominer, the statute itself is all that must be satisfied for Cheetah Miner to obtain preliminary relief. In other words, Cheetah Miner believes injunctive relief is appropriate if the district court agrees that the company established a probable violation of Michigan's Anti-Lockout Statute.

Our precedent, however, favors 19200 Glendale. In the preliminary injunction setting, "we apply our own procedural jurisprudence regarding the factors to consider in granting a preliminary injunction," and apply state law only as to the question of whether a plaintiff has shown "a

substantial likelihood of success on the merits of [the] underlying diversity action." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007); *see also Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 382 (6th Cir. 2023); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017); *see also Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1293–99 (11th Cir. 2022) (Pryor, C.J., concurring). *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir. 1991), offers an illustrative example. The plaintiff there sought preliminary equitable relief to remedy Michigan statutory violations. *Id.* at 102. Like Cheetah Miner, the plaintiff argued that the Michigan law at issue "necessarily authorizes the granting of preliminary injunctions," meaning "the only prerequisite for issuing a preliminary injunction . . . is showing that [the Michigan law] has been violated." *Id.* We disagreed. Preliminary relief, we explained, is procedural in nature as it "merely" preserves the "relative positions of the parties until a trial on the merits can be held." *Id.* (citations omitted). That being the case, federal law—that is, the four-part test—controlled. *Id.* In this analogous setting, what was true then remains true today.

**B.** With the traditional four-part test in mind, we can begin and end our analysis with the second factor: whether Cheetah Miner demonstrated an irreparable injury. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (recognizing that a preliminary injunction can be denied "based solely on the lack of an irreparable injury"). Consistent with a preliminary injunction's core purpose to preserve the status quo while litigation unfolds, *see S. Milk Sales*, 924 F.2d at 102, an irreparable injury is a likely (not merely possible) harm that would later impair the court's ability to grant an effective remedy, *Winter*, 555 U.S. at 22. Hypothetical or theoretical threats will not do. *D.T.*, 942 F.3d at 327.

4

The district court did not abuse its discretion in finding Cheetah Miner's case for irreparable harm wanting. Before the district court, Cheetah Miner focused nearly singularly on whether a violation of the Anti-Lockout Statute occurred. When it came to demonstrating an injury, Cheetah Miner primarily claimed that 19200 Glendale's denial of electricity to the cryptominer prevented it from conducting Bitcoin mining, resulting in "damages in the form of lost profits." Monetary injuries, however, are not irreparable. *See D.T.*, 942 F.3d at 327.

At the district court reply brief stage, Cheetah Miner unearthed a new theory for irreparable harm—a supposed reputational injury and accompanying loss of customer goodwill caused by "being put unceremoniously out of business." R. 8, PageID#264. Reputational loss, of course, can constitute irreparable harm. *ACT, Inc. v. Worldwide Interactive Network, Inc*., 46 F.4th 489, 503–04 (6th Cir. 2022) (observing that "interference with customer relationships and damage to reputation are precisely the sorts of injuries [that] are difficult to quantify monetarily, and thus constitute irreparable harm"). As the thinking goes, any accompanying loss of customer goodwill may be impossible for a court to later quantify, as such losses would turn on the activity of unknowable, future clients. *See Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017). Yet even then, the burden remains on the movant to show more than a speculative risk to its reputation. *See D.T.*, 942 F.3d at 327.

And on that front, we agree with the district court that Cheetah Miner failed to articulate how its reputation would be harmed absent a preliminary injunction. *See Cheetah Miner USA Inc. v. 19200 Glendale, LLC*, No. CV 23-10812, 2023 WL 3223856, at *5 (E.D. Mich. May 3, 2023). The evidence that Cheetah Miner brought to the district court's attention amounted to conclusory assertions that the cryptominer "suffered and will suffer . . . reputational injury." R. 9, PageID#287. That left the district court to speculate on a number of fronts. What was Cheetah

Miner's reputation as a cryptominer before its electricity was cut off? Were its current and potential customers aware of Cheetah Miner's electricity problems? And how would a court order restoring Cheetah Miner's electricity thereby preserve its reputation? Few answers were forthcoming. Cheetah Miner offered little more than "pronouncements [that] are grounded in platitudes rather than evidence," well short of the evidentiary level needed to demonstrate reputational harm. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63–64 (2d Cir. 2011).

Nor did Cheetah Miner act like an entity facing adversity that threatened an irreparable injury. Remember, it took the company a considerable time under the circumstances to seek a preliminary injunction—more than 60 days from the time it lost electricity. Ten more days passed until Cheetah Miner first mentioned the possibility of an irreparable injury. Sitting in the dark (literally) for weeks "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Bourne Co. v. Tower Recs., Inc.*, 976 F.2d 99, 101 (2d Cir. 1992) (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985)); *see also Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 267 (6th Cir. 1988). Equally true, because Cheetah Miner's alleged injury resulted when it was put "out of business" by the lack of electricity, it is hard to see how a preliminary injunction would have preserved whatever was left of Cheetah Miner's reputation as a cryptominer, having been out of the cryptocurrency game for roughly 10 weeks. Adding all of this together, we cannot say that the district court abused its discretion in not finding an irreparable harm at stake here.

With evidence of irreparable harm lacking, Cheetah Miner faults the district court for failing to conduct an evidentiary hearing to amass the necessary record. But it was Cheetah Miner's job to establish a likelihood of irreparable harm, not the district court's. *Winter*, 555 U.S. at 22. If Cheetah Miner thought it needed more evidence to do so, it could have argued for additional discovery or an evidentiary hearing. It did not. And it is too late now to do so. *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 975 (6th Cir. 2007).

### III.

We affirm the district court's denial of the motion for a preliminary injunction.