**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0563n.06

**No. 10-6531**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BRAKE PARTS, INC., | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | ***Aug 11, 2011*** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| DAVID LEWIS, | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| Defendant, | ) | |
| | ) | |
| SATISFIED BRAKE PRODUCTS, INC.; | ) | |
| ROBERT KAHAN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: GUY, COOK, and STRANCH, Circuit Judges.

COOK, Circuit Judge. Defendants Satisfied Brake Products, Inc. ("Satisfied") and Robert Kahan appeal the district court's grant of a preliminary injunction to the plaintiff in this misappropriation-of-trade-secrets action. Because we find that the district court did not abuse its discretion in awarding this interim relief, we affirm its decision.

I.

This collateral appeal stems from an ongoing civil dispute between American brake manufacturer Brake Parts, Inc. ("BPI") and its Canadian competitor Satisfied. In the underlying suit, BPI alleges that Satisfied—via secret correspondence with former BPI employee David

Lewis—illicitly procured confidential, proprietary information about BPI's product formulations, which Satisfied then integrated into its own manufacturing processes.

BPI hired Lewis as its Principal Development Engineer in the mid 1990s; he remained with the company until 2008, when BPI dismissed him for reasons unrelated to this action. The next year, BPI found evidence that Lewis violated his non-disclosure agreement by providing confidential, proprietary information to BPI's competitors. BPI sued Lewis in the Eastern District of Kentucky for breach of contract and misappropriation of trade secrets. During its ensuing investigation, BPI uncovered several emails between Lewis and Satisfied Vice President Robert Kahan dating back to 2006. In these emails, Lewis revealed confidential formulations and processes that he was developing for BPI. BPI consequently filed a second suit against Kahan and Satisfied, alleging misappropriation of trade secrets, tortious interference with contractual relations, and RICO violations. In 2010, the district court dismissed the RICO claims and consolidated the actions.

Prior to commencing litigation, BPI moved to enjoin "Satisfied from developing, producing, manufacturing and/or selling any products based in whole or in part on BPI's formulations." In the motion, BPI identified several Satisfied product lines—accounting for nearly seventy-five percent of Satisfied's annual sales—that allegedly included BPI formulations. Upon receiving BPI's motion, the court scheduled a two-day evidentiary hearing, during which both sides called employees and experts to testify. The court ruled that BPI's formulations were "trade secrets," and thus entitled to legal protection, but remained uncertain as to whether Satisfied "used" the formulations it received

from Lewis.[1]  *Brake Parts, Inc. v. Satisfied Brake Prods., Inc.*, No. 09-132-KSF, at 2 (E.D. Ky. Oct. 1, 2010) (unpublished interim order).  The court ordered another round of briefs and an additional hearing to address the issue.  At this second evidentiary hearing, BPI presented Steven Clare and Patrick Savage, two former Satisfied employees who testified that Satisfied had stolen and used BPI's formulations as early as 2000—years before Lewis's alleged misappropriations.  The court granted the preliminary injunction.  After failing to procure an emergency stay, Satisfied now appeals the court's decision.

## II.

In deciding whether to grant a preliminary injunction, the district court should consider the following:  "(1) the likelihood of [the movant's] success on the merits; (2) whether the injunction will save the [movant] from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).  "A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (internal quotation marks and citation omitted).  Yet these competing elements "are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

---

[1] The relevant Kentucky law offers alternate definitions of "misappropriation" involving either "use" or "disclosure."  *See* Ky. Rev. Stat. Ann. § 365.880(2).  Because BPI sought to enjoin Satisfied's alleged *use* of its formulations, the district court rightly employed the first iteration.

Our review of the district court's decision involves several standards. The district court's

finding of whether a movant is likely to succeed on the merits is a legal question that we review de

novo. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). The other three factors,

conversely, rest largely upon the district court's factual determinations, which we review for clear

error.[2] *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333

(6th Cir. 1997). But we review the court's ultimate determination, whether the four factors favor

preliminary injunctive relief, for abuse of discretion. *Id.* at 322. Under this "highly deferential"

standard, "we do not decide whether we would grant a preliminary injunction if we were acting in

the place of the district court." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Rather, we

may disturb the district court's decision "only if [it] relied upon clearly erroneous findings of fact,

improperly applied the governing law, or used an erroneous legal standard." *Hamilton's Bogarts,*

*Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (internal quotation marks and citation omitted).

In applying this framework, we analyze the district court's treatment of each preliminary-injunction

factor, then address its decision to grant injunctive relief.

A.

The district court first found that BPI was likely to succeed on the merits of its

---

[2]"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949).

misappropriation-of-trade-secrets claim. Satisfied contends that this finding is erroneous because

BPI offered inconsistent evidence in the two evidentiary hearings and failed to show that Satisfied

*used* its formulations. "In order to establish a likelihood of success on the merits of a claim, a

plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v.

Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). Yet "[a] party . . . is not required to prove

his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

(1981). Instead, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so

serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for

more deliberate investigation." *Six Clinics Holding Corp., II*, 119 F.3d at 402.

BPI's claim arises under the Kentucky Uniform Trade Secrets Act ("KUTSA"), Ky. Rev.

Stat. Ann. §§ 365.880–.900. KUTSA allows an aggrieved party to enjoin the "[a]ctual or threatened

misappropriation" of its trade secrets. *Id*. § 365.882(1). To succeed in its underlying case, BPI must

therefore show (1) that its product formulations qualify as "trade secrets" and (2) that Satisfied

"misappropriated" them.

KUTSA defines "trade secret" as "information, including a formula, . . . method, technique,

or process," that "[d]erives independent economic value . . . from not being generally known to, and

not being readily ascertainable by proper means by, other persons who can obtain economic value

from its disclosure or use," and "[i]s the subject of efforts that are reasonable under the

circumstances to maintain its secrecy." *Id*. § 365.880(4). "Whether a particular type of information

constitutes a trade secret is a question of fact." *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 671 (E.D. Ky. 2009).

During the first evidentiary hearing, BPI's former head of research and development, Christopher Shepley, testified about BPI's products and formulations. According to Shepley, (1) BPI's product development requires extensive, costly research; (2) BPI's competitors cannot reverse engineer its products[3]; (3) BPI's formulations explain how to replicate its manufacturing processes; and (4) BPI assiduously protects its formulations' secrecy. In light of Shepley's uncontroverted testimony, we agree that BPI's brake-pad formulations are archetypal trade secrets.

Accepting the court's first finding, we now turn to the issue of misappropriation. In its order, the district court defined misappropriation as follows: "A trade secret is misappropriated if the person who uses the information knows or has reason to know, at the time of disclosure or use, that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."

BPI offers ample evidence that Satisfied knowingly received BPI brake-pad formulations from Lewis, in breach of Lewis's duty of confidentiality to his employer. At the first evidentiary hearing, Lewis testified that he signed non-disclosure agreements with BPI, in which he agreed that

---

[3]Though Satisfied's witnesses contended that manufacturers could *partially* reverse engineer a competitor's brake pads, they all conceded that certain important factors, such as organic content or mix order, could not be determined this way.

"[he would] not . . . use or disclose to any third party any confidential information . . . known to or created by [him] as a result of [his] employment." Yet Lewis admitted that between 2006 and 2008, he accepted thousands of dollars from Kahan to transmit BPI brake-pad formulations—many of which BPI conspicuously marked as "confidential"—via secret email accounts.[4] The evidence demonstrates that Kahan received confidential information from Lewis and had reason to know that Lewis's disclosure violated his duty of secrecy to BPI.

Faced with such incriminating evidence, Satisfied does not refute that it paid Lewis to steal BPI's product formulations, but instead maintains that it never *used* those formulations. The district court, however, disagreed. In reaching this conclusion, the court relied heavily upon BPI's expert witness, Dr. Peter Filip. Filip, who compared the BPI formulations Lewis transmitted with those of Satisfied's competing products, effectively concluded that in each instance Satisfied had "cloned" the BPI analogue.[5] Filip based his assertions on the unusual similarities between the products' components. He noted that in one instance the formulations for the Satisfied product and its BPI

---

[4]BPI introduced dozens of Lewis's emails into evidence. The emails indicate—and the court accordingly found—that Lewis transmitted the following formulations to Kahan: (1) BPI 4041 (an underlayer product that connects brake pads and plates), (2) BPI 5549 and Challenger 20 (two semi-metallic brake-pad lines), and (3) BPI 312NB and several iterations of BPI 005 (two ceramic brake-pad lines).

[5]Specifically, Filip testified that the following Satisfied products were BPI clones: (1) Satisfied underlayer 9010, cloned from BPI 4041; (2) Satisfied semi-metallic SV5, cloned from BPI Challenger 20; (3) Satisfied semi-metallic SV10 and SV10-1004, both cloned from BPI 5549; (4) Satisfied ceramic CE20 and CE30, cloned from BPI 005; and (5) Satisfied ceramic GS5, cloned from BPI 312NB.

analogue even involved the same obvious arithmetic error, each containing raw materials whose proportions summed to 105% of the final product. Although Satisfied's expert "c[ould not] say one company copied another company's formula," the court found this expert less credible because he was not even aware that Lewis transmitted BPI's formulations to Satisfied. The court, moreover, noted that Satisfied offered no explanation as to why its products resembled BPI's so closely. Finally, the court commented that the testimony of Clare and Savage—the two Satisfied employees who admitted to copying BPI's formulations in 2000—lent further support to BPI's claims.

The court's interpretation of the evidence is not only permissible, but logical. Although Satisfied argues that BPI's complaint, which alleged misappropriation *by Lewis*, conflicted with Savage and Clare's testimony—since Satisfied had already procured and used BPI's formulations before Lewis began leaking them—the court did not find the two instances of espionage incongruent; the fact that Satisfied obtained information from BPI before Lewis started working with them did not mean that Satisfied never used Lewis's information to further update its formulations. Indeed, BPI points out several small production changes that Satisfied implemented after receiving suggestions from Lewis. But even absent this corroboration, the court offers the most sensible interpretation of the evidence. Why else would a company—whose products inexplicably mirror those of its competitor—pay its competitor's employee thousands of dollars to leak the competitor's product information if not to use that information? The court's finding regarding Satisfied's use of

BPI's trade secrets is not clearly erroneous.[6]

Piecing together the district court's separate factual findings—(1) that BPI's formulations are trade secrets and (2) that Satisfied received and used these secrets from Lewis in knowing violation of Lewis's confidentiality agreement—leads us to the inevitable conclusion that BPI demonstrated an adequate likelihood of success on the merits.

In support of the court's ruling, we highlight two additional points on the "use" issue. First, though the district court required BPI to offer convincing evidence that Satisfied used Lewis's information, a movant need not prove his case in full at the preliminary-injunction stage. *See Camenisch*, 451 U.S. at 395. In our view, even after the first evidentiary hearing, BPI raised "questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation," thus meeting its burden. *See Six Clinics Holding Corp., II*, 119 F.3d at 402. Second, in interpreting Tennessee's Uniform Trade Secrets Act, Tenn. Code Ann. §§ 47-25-1707–1709, this court recognized that "requiring direct evidence [of use] would foreclose most trade-secret claims from reaching the jury." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 601 (6th Cir.

---

[6]In its brief, Satisfied also attacks the district court's finding regarding BPI's likelihood of success on the merits based upon a comment the court made in its memorandum. When considering whether BPI had met its burden, the court stated "this is a close case," but then immediately concluded that BPI was likely to succeed. The court offered no additional explanation for the remark, making it hard for us to interpret. Moreover, at other points during the evidentiary hearing, the court made similar "off the cuff" comments to the contrary. Meanwhile, its legal determination—upon which we focus our attention—is clear: BPI *is* likely to succeed on the merits of its trade secrets claim.

2005). We therefore held—despite an absence of state-court decisions on the issue—that "courts may properly consider circumstantial evidence concerning similarity of design plus access to the design to imply use by a defendant of a trade secret." *Id*. at 600. Several other circuits have embraced our position. *See id.* (citing cases from the Second, Third, Fourth, Seventh, Eighth, Ninth, and Federal Circuits permitting factfinders to infer use); *see also Auto Channel Inc., v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 788 (W.D. Ky. 2001) ("Because KUTSA is a uniform law, . . . decisions in other jurisdictions provide guidance for its application and construction."). Thus, to the extent that Kentucky law would allow BPI to demonstrate "use" via circumstantial evidence of access and similarity, BPI has shown an extremely high likelihood of success on the merits of its claim.

B.

Satisfied next argues that BPI failed to demonstrate a risk of irreparable harm, since its alleged injury is "suspect" and, in any case, readily compensable via monetary damages. When courts consider irreparable harm, "[t]he key word . . . is irreparable," and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against [the] claim." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks and citation omitted). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

In ruling that BPI would suffer irreparable injury absent an injunction, the district court identified three distinct, incalculable harms: loss of goodwill, loss of competitive advantage, and loss of research incentives. This "fact-bound" finding reiterates the irrefuted testimony of BPI's former head of research and development, and is thus not clearly erroneous. Nor does the finding misconstrue precedent. In *Basicomputer*, we upheld a district court's finding of irreparable injury based upon the plaintiff's allegations of "loss of customer goodwill" and "loss of fair competition" stemming from its ex-employees' threatened breach of non-competition and confidentiality agreements. 973 F.2d at 512.

We find Satisfied's attempts to factually distinguish *Basicomputer* unpersuasive. Admittedly, in that case, the district court preliminarily enjoined the defendants from using confidential customer lists in violation of non-disclosure *and* non-competition agreements. Yet Lewis's case is arguably more egregious; even absent a non-competition agreement, he was *still employed* by BPI at the time of his transgressions and thus owed BPI a duty of loyalty and faithfulness. *See, e.g.*, *DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir. 1985) (applying Kentucky employment law); *accord Hoge v. Ky. River Coal Corp.*, 287 S.W.2d 226, 227 n.3 (Ky. Ct. App. 1926). And, in any event, the fact that *Basicomputer* involved both non-disclosure and non-competition agreements has little bearing on the central issue: the incalculable harm alleged. Like the plaintiff in *Basicomputer*, BPI asserts that it cannot readily calculate the harm—in terms of lost market position, goodwill, and research incentives—that Satisfied's ongoing misdeeds will cause.

In its reply brief, Satisfied mounts yet a different challenge, citing a string of district-court decisions rejecting plaintiffs' "conclusory allegations" as grounds for finding irreparable harm. Yet this position fails to afford the district court its due deference. In the instant case, the district court *did* find that BPI's allegations made a showing of irreparable harm. Were we deciding the issue de novo—which, as precedent clearly holds, we are not, *see Leary*, 228 F.3d at 739—these cases might prove more illustrative. But because we defer to the district court's factual findings, we review them only for clear error. And, given that the district court's finding accords with both the evidentiary record and Sixth Circuit precedent, Satisfied proffers insufficient grounds upon which to challenge its decision.

C.

Satisfied next contends that the district court's decision inadequately weighs the harm to "others"—namely itself, its customers, its suppliers, and its employees. Indeed, in deciding whether to grant a preliminary injunction, the district court must consider the harm that the injunction would cause the non-movant. *See, e.g.*, *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006). But neither this nor any single preliminary-injunction factor is dispositive. *See Jones*, 341 F.3d at 476. The district court must thus grant or deny an injunction as the balance of the equities requires, even though its decision may place one party in financial peril. *See, e.g.*, *Blue Cross & Blue Shield Mut. of Ohio*, 110 F.3d at 333–34 (discounting the harm to the non-movant where the movant demonstrated a strong likelihood of success on the merits of its underlying claim);

*see also Samuel v. Herrick Mem'l Hosp.*, 201 F.3d 830, 836–37 (6th Cir. 2000) (reversing the district court's preliminary injunction, despite the movant's imminent risk of financial ruin, where other factors weighed against granting relief).

In its order, the district court candidly admitted that an injunction might harm or terminate Satisfied's business. But, in its opinion, "no harm w[ould] result to any third parties by entry of preliminary injunctive relief." When arguing before the district court, Satisfied offered no evidence to the contrary.[7] And though the court clearly discounted the expected harm to Satisfied, precedent by no means forbids this approach, especially since the court found that the other factors favored granting the preliminary injunction and that Satisfied "knowingly and illegally placed itself in the position to be placed out of business." *See Hickman v. Turitto*, No. 1:06-CV-151, 2007 WL 1080090, at *3 (E.D. Tenn. Apr. 9, 2007) (discounting harm to defendant in enjoining him "from doing something he already should not be doing"); *see also Lorillard Tobacco Co.*, 453 F.3d at 382 (dismissing the harm to defendant enjoined from counterfeiting as "hardly a legally cognizable one").

D.

In considering the public interest, the district court again sided with BPI, ruling that "[t]he

---

[7]In its appellate brief, Satisfied contends that the district court's decision harms its clients and suppliers. As evidence of this harm, Satisfied mentions that one of its customers moved to intervene in the case. But because the customer filed its motion nearly two weeks *after* the district court granted the injunction, the court had no reason to consider Satisfied's customer when contemplating harm to third parties.

public has an interest in the promotion of fair competition and the discouragement of unfair competition." This finding does not run afoul of the evidentiary record and aligns with circuit precedent. *See, e.g.*, *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir. 2003) (per curiam) ("[T]he public has an interest in discouraging unfair trade practices . . . ."); *Bailey v. Chattem, Inc.*, 684 F.2d 386, 391 (6th Cir. 1982) (acknowledging "the strong public interest in free and fair competition"). In its brief, Satisfied does not address the issue of unfair competition, but rather warns of the injury that will befall its customers and suppliers if it goes bankrupt. The court, however, addressed this argument when considering "harms to others." To the extent that the district court believed Satisfied was engaging in unfair competition—and the evidentiary record strongly suggests that it was—it did not clearly err in finding that the public interest weighs in favor of enjoining this behavior.

E.

The district court's decision to grant the preliminary injunction follows logically from its individual determinations regarding the four preliminary-injunction factors. Because nothing in the court's order or supporting memoranda suggests that it "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard," *see Hamilton's Bogarts, Inc.*, 501 F.3d at 649 (internal quotation marks and citation omitted), we do not disturb its weighing of these factors.

III.

For these reasons, we affirm the district court's grant of a preliminary injunction to the plaintiff.