NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0041n.06

Case No. 20-3264

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 21, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ATRICURE, INC., | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| DR. JIAN MENG, *et al.*, | ) | |
| | ) | **O P I N I O N** |
| Defendants-Appellants. | ) | |

BEFORE: COLE, Chief Judge; McKEAGUE and WHITE, Circuit Judges.

McKEAGUE, Circuit Judge. AtriCure, Inc. (AtriCure) sued its long-time Chinese distributor Dr. Jian Meng when AtriCure began to believe that Dr. Meng used confidential information to copy the entire line of products Dr. Meng distributed for AtriCure. After a two-day hearing, the district court granted AtriCure a preliminary injunction based on AtriCure's trade-secret claim, enjoining Dr. Meng and his companies from marketing, producing, and selling any products substantially similar to AtriCure's. Dr. Meng appeals, arguing that AtriCure did not adequately prove any information to be a trade secret, that AtriCure did not adequately prove Dr. Meng received and used any information, and that the injunction should not reach into China. We **AFFIRM** the district court's grant of the preliminary injunction.

**I**

AtriCure is an Ohio medical-device company that sells products to treat atrial fibrillation (Afib), a degenerative heart disease characterized by an irregular heartbeat. AtriCure developed the Isolator Synergy Ablation System (Isolator System) in the early 2000s. The Isolator System is a cardiac ablation device, using physical force and electricity to carefully treat the cardiac tissues that cause Afib.

The Isolator System has several components. The most important is the Ablation and Sensing Unit (ASU), which houses the algorithm that controls the System. There are also the Ablation Switch Box (ASB) and the single-use clamps and pens, which surgeons use to operate when plugged into the ASU and ASB. The key difference between the Isolator System and other ablation systems is that the Isolator System takes in data relating to the tissue characteristics of the patient's heart and uses its algorithm to make dynamic changes to the amount of mechanical pressure and electricity output used to ablate the tissue. Other devices just output a fixed amount of electricity. That makes the algorithm, the brain of the system, unique on the market.

AtriCure also produces the AtriClip. The AtriClip treats Afib by blocking the left atrial appendage, improving upon prior usage of sutures, staples, or removal of the appendage. The district court found that "AtriClip is unique on the market . . . [because of] its ability to clamp onto tissue and allow that tissue to be reabsorbed into the body, the ability to deliver force dynamically depending on the type of tissue (e.g., 'fatty tissue'), and the specific knit-braided fabric utilized."

AtriCure spent a lot of time and money developing the Isolator System and the AtriClip. Getting the Isolator System to market took at least fifty million dollars. AtriCure's business-model also has high entry barriers. AtriCure does not make money by selling the Isolator System. Instead, AtriCure loans the Systems to hospitals and sells the hospitals the disposable parts like

the clamps and the pens. At the time of the preliminary-injunction hearing, AtriCure had 75% of the U.S. market and 60% of the world market for Afib treatment.

Dr. Jian Meng was AtriCure's distributor in China from 2005 until 2017. AtriCure needed a Chinese agent to register and sell its products in China, and Dr. Meng (a Chinese citizen) approached AtriCure for a partnership for that purpose. In particular, Dr. Meng[1] was responsible for getting AtriCure's line of products registered by the Chinese analog to the Food and Drug Administration (CFDA). Dr. Meng signed multiple distribution agreements with AtriCure that included non-compete clauses and confidentiality agreements.

Unbeknownst to AtriCure, Dr. Meng was the president of Med-Zenith, AtriCure's Chinese competitor. Med-Zenith produces cardiac ablation products, including an ablation system, clamps, and pens. The products look very similar to their AtriCure counterparts (according to the district court), but Med-Zenith asserts that it developed them by doing market research and looking at the devices of companies other than AtriCure. According to Med-Zenith, the algorithm in its ablation system was developed by a different company, Shanghai Hong Tong Industrial Co., Ltd., Med-Zenith did not assist Hong Tong with their algorithm, and Med-Zenith has no access to Hong Tong's algorithm. Med-Zenith also produces an adaptor that connects clamps to ablation systems; the adaptor can connect Med-Zenith clamps to the AtriCure ASU. Med-Zenith gives these adaptors to Chinese hospitals for free. While Med-Zenith's products have only Chinese patents as of yet, Med-Zenith has United States patents pending and is applying for patents worldwide.

AtriCure eventually became aware of Med-Zenith and sued Dr. Meng for trade-secret misappropriation, among other claims. AtriCure alleges that,

> [a]s a result of the 2005 and 2011 Distribution Agreements, and the respective renewals thereof, Dr. Meng and his entities were given access to proprietary and

---

[1] This opinion refers to the defendants collectively, for the sake of simplicity, as "Dr. Meng."

confidential information owned by AtriCure, including detailed drawings and manufacturing specifications for materials, information regarding the pricing and vendors of AtriCure's products, the proprietary ASU algorithm, and the function and use of AtriCure's products.

Dr. Meng used that confidential information, AtriCure alleges, to create an entire line of competing products.

AtriCure moved for a preliminary injunction to prevent Dr. Meng "from continuing to manufacture and sell counterfeit versions of AtriCure's medical devices in the United States and worldwide during the pendency of this litigation." The district court held a hearing. AtriCure presented seven witnesses, including (1) Douglas Seith, AtriCure's Chief Operating Officer (COO), (2) Salvatore Privitera, Atricure's Chief Technology Officer (CTO), and (3) Michael Carrel, AtriCure's Chief Executive Officer (CEO), among others. Both parties submitted exhibits, and Dr. Meng presented no witnesses. Dr. Meng neither testified nor submitted a declaration.

The district court granted the injunction. The court found that "[t]he internal design, the external design, technical information and functioning of the AtriCure Isolator System and its components, . . . the AtriClip, . . . [and t]he algorithm contained within the AtriCure ASU" were trade secrets. The court also found that "Dr. Meng and his companies were given access to the alleged trade secrets," that Dr. Meng "admitted to AtriCure's CEO [Carrel] . . . that Med-Zenith had taken AtriCure's technology," and that Dr. Meng's factual assertions that they built their products independently were not credible. The district court concluded that AtriCure was likely to succeed on the merits of its trade-secret misappropriation claim and issued a preliminary injunction with worldwide effect. The injunction prohibits Dr. Meng from "[m]anufacturing, creating, . . . [m]arketing, [and] selling" any product "substantially similar to any of . . .

AtriCure['s] [p]roducts," as well as prohibiting Dr. Meng from "[s]elling or providing free of charge the adapter" that links the AtriCure ASU to other products.

Dr. Meng appeals.

## II

The standard of review for a preliminary injunction is abuse of discretion, with legal conclusions reviewed de novo and factual findings reviewed for clear error. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 536 (6th Cir. 2020). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Thompson v. DeWine*, No. 20-3526, 2020 WL 5742621, at \*2 (6th Cir. Sept. 16, 2020) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). On appeal, likelihood of success on the merits is a legal conclusion reviewed de novo. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007). The remaining factors are factual determinations reviewed for clear error. *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333 (6th Cir. 1997).

The standards of proof and evidentiary burdens under the Ohio Uniform Trade Secrets Act (OUTSA) are relevant to whether AtriCure established that it is likely to succeed on the merits. "Whether information constitutes a trade secret is a question of fact." *In re Rev. of Alt. Energy Rider Contained in Tariffs of Ohio Edison Co.*, 106 N.E.3d 1, 9 (Ohio 2018). The plaintiff bears the burden to prove a trade secret, *State ex rel. Luken v. Corp. for Findlay Mkt. of Cincinnati*, 988 N.E.2d 546, 551 (Ohio 2013), by a preponderance of the evidence, *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999). To obtain an injunction under Ohio Rev. Code

§ 1333.62, a plaintiff must prove the trade-secret claim's elements by clear and convincing evidence. *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 273 (Ohio Ct. App. 2000).

## III

The district court held that AtriCure was likely to succeed on its trade-secret claim and Dr. Meng appeals that holding. The key disputes are whether AtriCure adequately specified what information related to its products are trade secrets, and whether AtriCure proffered evidence to show that Dr. Meng received and used the trade secrets. These are fact questions. Affording the district court the deference due under clear-error review and considering that "[a] party is . . . not required to prove his case in full at a preliminary-injunction hearing," we find no clear error, we affirm the district court's likelihood-of-success holding, and we affirm the grant of the preliminary injunction. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

### A.

The trade-secret claim here is a creature of state law. In 1994, Ohio adopted OUTSA. Ohio Rev. Code §§ 1333.61–69. OUTSA codified the preceding common law, *Hydrofarm, Inc. v. Orendorff*, 905 N.E.2d 658, 663 (Ohio Ct. App. 2008), and aligned Ohio law with the other states adopting the Uniform Act, *Al Minor & Assocs., Inc. v. Martin*, 881 N.E.2d 850, 854 (Ohio 2008).

A trade secret is information.[2] The information must derive value from its secrecy and cannot be "readily ascertainable by proper means." Ohio Rev. Code § 1333.61(D)(1). Examples "includ[e] the whole or any portion . . . of . . . technical information, design[s], . . . [and] device[s]."

---

[2] There is a six-factor test to determine if information is a trade secret. *See State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997) (first enumerating the factors for Ohio); *see* Restatement (First) of Torts § 757 cmt. b. The test is met in this case, but the analysis is not central to the appeal because Dr. Meng challenges a premise that precedes the factor test: whether Dr. Meng even had the specific information as alleged by AtriCure.

*Id.* § 1333.61(D).  A plaintiff can prove trade-secret misappropriation under OUTSA by proving a defendant's "acquisition" of the secret or "disclosure or use" of the secret.  *Id.* § 1333.61(B).

**B.**

Here, the district court held that AtriCure was likely to prove trade-secret misappropriation by use.  The holding was premised on three factual findings: (1) that the enumerated pieces of information were sufficiently specific trade secrets, (2) that AtriCure sent the trade secrets to Dr. Meng, and (3) that Dr. Meng used the trade secrets.  Reviewing for clear error and cognizant that "a preliminary injunction is customarily granted on the basis of . . . evidence that is less complete," we affirm the findings.  *Camenisch*, 451 U.S. at 395.  Accordingly, the district court did not err in holding AtriCure to be likely to succeed on its trade-secret misappropriation claim.  *See Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 31 (6th Cir. 2011) (holding that the legal conclusion was "inevitable" after affirming the same factual findings).

**1.  The district court's trade-secret findings were sufficiently specific.**

The district court listed the likely trade secrets as "[t]he internal design, the external design, technical information and functioning of the AtriCure Isolator System and its components, . . . the AtriClip, . . . [and t]he algorithm contained within the AtriCure ASU."  Dr. Meng argues that the district court's definitions were not sufficiently specific.

A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge.  *See Alice's Home v. Childcraft Educ. Corp.*, No. 09-299, 2010 WL 3448319, at *4 (Ohio Ct. App. 2010) (stating that the proponent of a trade secret must "fully articulat[e] . . . precisely what aspects of [a product] . . . constitute[] a protectable trade secret"); *see also Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 922 (6th Cir. 2008) ("[T]he

secret information must afford the owner a competitive advantage by having value to the owner and potential competitors.").

But the specificity bar is not as high as Dr. Meng tries to set it. The district court made specific findings about what makes AtriCure's products uniquely valuable. For example, the district court found that "the AtriClip's unique properties consist of, among other things, its ability to clamp onto tissue and allow that tissue to be reabsorbed into the body." Regarding the algorithm, the district court found that the "algorithm performs virtually simultaneous multi-factorial problem solving that allows the system to assess ablation success as it is happening and adjusts the power or other technological factors of the system in real time," and found that feature to be unique across the market. *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 753 (10th Cir. 2011) (holding that a unique algorithm, being "exceptionally difficult" to replicate, is a trade secret).

The district court could have been more specific about the unique features of the products, including AtriCure's clamp. But this case is sufficiently distinct from those to which Dr. Meng looks to for support. For example, Dr. Meng cites to *AMP Inc. v. Fleischhacker* for the proposition that the definition of a trade secret as "confidential business and technical information" is too broad. 823 F.2d 1199, 1203 (7th Cir. 1987). But the issue in that case was that "the plaintiff [could not] point to any tangible work product, such as blueprints, designs, plans, processes, or other technical specifications, at risk of misappropriation." *Id.* at 1205.

Here, the district court found that AtriCure gave Dr. Meng "detailed drawings and manufacturing specifications for materials" in order to "assist with approvals and distribution of all components of AtriCure's Isolator System." So even the products for which the district court failed to make explicit findings about unique features survive the specificity requirement. As long

as the district court did not clearly err in finding that such drawings relating to each component changed hands, then we cannot say the district court clearly erred by defining the trade secrets too generally as to any component.

### 2. The district court did not clearly err in finding that AtriCure sent Dr. Meng trade-secret information.

Dr. Meng argues that AtriCure provided "no evidence" that Dr. Meng received any information relating to AtriCure's products. But the district court credited AtriCure's COO's testimony that AtriCure gave Dr. Meng "everything, soup to nuts, on how the devices were built." The COO could not identify specific documents but testified that for Dr. Meng to obtain CFDA approval and licenses, AtriCure sent Dr. Meng "drawings," "specifications," and "probably tolerances," among other things. And that was not the only evidence of transmission. The CEO testified that Dr. Meng had "taken all of our documents and basically copied our product."

The district court did not clearly err in crediting these statements. First, Dr. Meng did not testify (or submit a declaration) to the contrary. Second, the district court interpreted testimony from both the COO and the CEO to be an admission by Dr. Meng that Dr. Meng took AtriCure's technology.[3] Finally, the district court used the similarity between Dr. Meng's and AtriCure's devices as circumstantial evidence that Dr. Meng had access to secret information. *Stratienko v. Cordis Corp.*, 429 F.3d 592, 601 n.2 (6th Cir. 2005) (noting that circumstantial evidence is permissible in trade-secret cases); *EEMSO, Inc. v. Compex Techs., Inc.*, No. 05-0897, 2006 WL 2583174, at *8 (N.D. Tex. Aug. 31, 2006) (holding that similarities between products was the "most compelling[]" evidence that the defendant obtained trade-secret information).

---

[3] AtriCure's CEO testified that after he confronted Dr. Meng in Amsterdam about Med-Zenith's competing products, Dr. Meng "admitted that he ran [Med-Zenith], and he told me that yes, in fact, it had taken our technology and that they were basically in the process of building it out."

"The [district] court's interpretation of the evidence is not only permissible, but logical." *Brake Parts*, 443 F. App'x at 31.

### 3. The district court did not clearly err in finding that Dr. Meng used the trade-secret information.

Armed with the finding that AtriCure sent Dr. Meng the trade-secret information, it is easy to likewise affirm the finding that Dr. Meng used the information. Dr. Meng argues that "superficial similarities in form or function" cannot demonstrate trade-secret usage. But here, the district court relied on Dr. Meng's admission to taking the technology, the court's own examination of the products (inside and out) during which the court found the products "nearly identical," and AtriCure's CTO's testimony about the striking similarities between the products. Having accepted the findings that AtriCure's products' designs were trade secrets and that AtriCure sent the trade secrets to Dr. Meng, the question at this juncture is not whether the conspicuous similarities could have been the product of reverse-engineering. Rather, the question is whether the district court clearly erred by finding that Dr. Meng used AtriCure's trade secrets—not reverse engineering—to make his products. The district court thus permissibly premised the use finding on the antecedent finding that Dr. Meng was selling "a full line of products that mimic the entire AtriCure line of products." Again, we conclude that "the [district] court offers the most sensible interpretation of the evidence." *Brake Parts*, 443 F. App'x at 31.

### 4. The district court did not err in holding that the production and distribution of the Med-Zenith adaptor was likely a misappropriation of the trade-secret algorithm.

Dr. Meng correctly asserts that no evidence definitively demonstrates that AtriCure sent its proprietary algorithm source code to Dr. Meng. On the contrary, the fact that Dr. Meng developed

an adaptor in order to plug AtriCure's ASU into his own products indicates that Dr. Meng had neither the algorithm source code nor a replication of the algorithm.

But "use" is a broad term for trade secrets. "As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment of the defendant is a 'use.'" Restatement (Third) of Unfair Competition § 40 cmt. c. For example, "relying on the trade secret to assist or accelerate research or development" is a use. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir. 2013) (quoting *Gen. Universal Sys. Inc. v. HAL Inc.*, 500 F.3d 444, 451 (5th Cir. 2007)). Here, the district court found that "AtriCure spent approximately fifty million dollars and hundreds of thousands of man-hours in research and development to bring the Isolator System to market," and the algorithm code is the System's critical input. It seems that Dr. Meng could not crack the code, so he figured out a way to profit from the code without cracking it. That demonstrates ingenuity, but also likely injury to AtriCure.

Thus, even if the district court clearly erred in finding that AtriCure sent the algorithm source code to Dr. Meng, the trade-secret claim with regard to the algorithm and the adaptor is still likely to succeed.

* * *

"Piecing together the district court's separate factual findings—" (1) that AtriCure's designs, etc., "are trade secrets and (2) that [Dr. Meng] received and used these secrets . . . leads us to the inevitable conclusion that [AtriCure] demonstrated an adequate likelihood of success on the merits." *Brake Parts*, 443 F. App'x at 31. We expect the debate over the evidence's sufficiency to continue at trial, but at this stage we hold that AtriCure "has raised questions going to the merits

so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 403 (6th Cir. 1997).

We likewise see no clear error in the district court's analysis of the remaining preliminary-injunction factors. We therefore affirm the district court's grant of the preliminary injunction.

**IV**

But we're not finished just yet. Two questions about the preliminary injunction remain: (1) whether the district court abused its discretion in determining the scope of the injunction, and (2) whether OUTSA has extraterritorial effect. Answering the former "no" and the latter "yes," we affirm.

**1. The district court did not abuse its discretion in determining the scope of the injunction.**

Federal courts have the authority to issue orders with international reach. *See, e.g.*, *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952); *Rogers v. Webster*, 779 F.2d 52, 1985 WL 13788, at *2 (6th Cir. 1985) (per curiam) (unpublished table decision). Of course, the discretion to exercise such authority is not without limit. *See* 11A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 2945 (3d ed. Oct. 2020 update) (discussing common considerations). One critical limitation is whether the order, such as an injunction, offends international comity. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993). As such, we construe Dr. Meng's argument on appeal that "[t]he district court's extraterritorial preliminary injunction exceeded its authority" as arguing that the district court abused its discretion. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.").

We hold that the international reach of the injunction comports with the equities of the case and that the injunction does not offend international comity. The district court enjoined Dr. Meng only from activities by which he could profit from selling products "substantially similar" to AtriCure's. The purpose of the injunction is to halt any further alleged harm to AtriCure. To limit the scope of the injunction to the United States would afford AtriCure almost no protection. That's why international injunctions are often necessary, before and after trial, in trade-secret cases. *See Bowers*, 643 F.3d at 752; *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991); *Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1377 (11th Cir. 1982) (applying Ohio trade-secret common law); Restatement (Third) of Unfair Competition § 44 cmt. d (1995) ("Geographic limitations are not ordinarily appropriate in trade secret injunctions."). The international scope of the injunction was within the district court's discretion.

Regarding international comity, Dr. Meng argues that his products are approved for sale in China and raises the concept of choice-of-law without analysis. This is insufficient to merit a reversal of the preliminary injunction on comity grounds. Dr. Meng did not, for example, demonstrate that the court's "decree would require one to 'violate foreign law' or would 'place [one] under risk of double liability.'" *Rogers*, 779 F.2d 52, at *3 (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965)). And as the district court noted, the United States and China recently signed an agreement that "emphasizes trade secret protection." Economic and Trade Agreement Between the Government of the United States of America and the Government of the People's Republic of China, Jan. 15, 2020, ch.1 § B. Rather than presenting irredeemable conflict, the United States's and China's trade-secret laws have substantial overlap, including the permissibility of preliminary and permanent injunctions. *See* Melvin F. Jager, 4 Trade Secrets Law, App. Q (2020); *see also E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp.

2d 691, 719 (E.D. Va. 2012), *vacated and remanded on other grounds*, 564 F. App'x 710 (4th Cir. 2014). The district court did not abuse its discretion by determining the injunction did not offend international comity.

### 2. OUTSA has extraterritorial effect.

Implicit in Dr. Meng's injunction argument is the question of whether OUTSA can apply extraterritorially. In other words, the question is whether OUTSA provides a remedy for conduct occurring, at least substantially, outside of Ohio. We hold, at least in this case, that it does.

States may regulate conduct extraterritorially. *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941). But Ohio courts have not explicitly addressed whether, or in what circumstances, OUTSA has extraterritorial reach.[4] So we turn to statutory interpretation.

The text of OUTSA has no clear statement for or against extraterritorial effect. But the intent of the statute is the lodestar of statutory interpretation in Ohio. *Piazza v. Cuyahoga County*, 138 N.E.3d 1108, 1112 (Ohio 2019). And the statute's injunction provision implies an extraterritorial intent. Trade-secret injunctions stretch either until a trade-secret has "ceased to exist" or until the injunction "eliminate[s the] commercial advantage that otherwise would be derived from the misappropriation." Ohio Rev. Code § 1333.62. This language falls on the side of extraterritoriality because only extraterritoriality could achieve the legislature's intent to eliminate the violator's commercial advantage.

The legislative history, though sparse, also favors extraterritoriality. A proponent of the bill told the Ohio Senate that the law was necessary "due to the 'explosion' in the development of computer software and the proliferation of companies expanding into the international market."

---

[4] We note that whether OUTSA reaches extraterritorially is a merits question, because if the statute cannot give AtriCure the remedy it seeks then AtriCure would fail to state a claim. *Cf. Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 986 (9th Cir. 2016) (holding that whether the Lanham Act reaches extraterritoriality is a merits question).

*Hearing on H.B. 320 Before the S. Econ. Dev., Tech., and Aerospace Comm.*, 120th General Assembly (Ohio 1994) (statement of Dwight Marshall, Ohio State Bar Ass'n).  The Ohio legislature thus contemplated the possibility of international injury and remedy to domestic companies.

The purposes underlying pre-OUTSA Ohio trade-secret injunctions also indicate an extraterritorial effect.

> The underlying purposes of the injunction in this case are: to prevent [Defendants] from being unjustly enriched, to prevent [Plaintiff's] secrets from being disclosed to the public without its consent, to penalize [Defendants] for their unethical and unlawful behavior, and to protect [Plaintiff's] investment.

*Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 820 (Ohio 1986).  If the protections could not reach beyond Ohio's borders, the law could accomplish none of those purposes in many cases.  And because OUTSA codified the existing common law, *Hydrofarm*, 905 N.E.2d at 663, the fact that trade-secret injunctions generally lacked geographic restrictions at common law is important, *Plasschaert*, 674 F.2d at 1377 (extraterritorial injunction under Ohio trade-secret common law); Restatement (Third) of Unfair Competition § 44 cmt. d (1995).

Finally, to hold that OUTSA lacks extraterritorial reach would be out-of-step with precedent.  Our Circuit has allowed extraterritorial injunctions under OUTSA and its sister-state analogs.  *See, e.g.*, *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 163 (6th Cir. 2020); *Brake Parts*, Nos. 09-132, 10-212, 2011 WL 93036, at *1 (E.D. Ky. January 11, 2011), *aff'd*, 443 F. App'x 27 (6th Cir. 2011); *Park-Ohio Indus., Inc. v. Carter*, No. 06-15652, 2007 WL 470405, at *14 (E.D. Mich. Feb. 8, 2007).  As have others.  *See, e.g.*, *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1113 (8th Cir. 2020); *Bowers*, 643 F.3d at 752; *Lamb-Weston*, 941 F.2d at 974; *DuPont*, 894 F. Supp. 2d at 713.  We won't depart from these cases here.

Two other quick points merit mention. We decline Dr. Meng's invitation to graft an effects test, such as that applied to Lanham Act cases, onto OUTSA's application. *Cf. Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956) (articulating an early version of the test). That effects test is derivative from the Supreme Court's interpretation of the text of the Lanham Act in light of the federal presumption against extraterritoriality. *Steele*, 344 U.S. at 286–87. Neither the text of the Lanham Act nor a presumption against extraterritoriality are relevant here.[5] *See DuPont*, 894 F. Supp. 2d at 716.

At base, trade-secret injunctions are meant to "place the injured party in the position that he or she would have been in had the misappropriation of the trade secret not taken place." *See* Robert F. Koets, 88 Ohio Jur. 3d Trade Secrets § 25 (3d ed. Aug. 2020 update). Without the possibility for remedies reaching out-of-state and internationally, OUTSA would be unable to achieve that goal.

## V

For the reasons above, we AFFIRM the order of the district court.

---

[5] At oral argument, Dr. Meng contended that Ohio employs a presumption against extraterritoriality by citing to *Stetson v. City Bank of New Orleans*, 2 Ohio St. 167, 174 (1853). More recent case law demonstrates that Ohio does not apply such a presumption in interpreting statutes. *See, e.g.*, *State ex rel. Natalina Food Co. v. Ohio Civ. Rts. Comm'n*, 562 N.E.2d 1383, 1385 (Ohio 1990); *Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 856–58 (Ohio Ct. App. 2000); *see also* William S. Dodge, *Presumptions Against Extraterritoriality in State Law*, 52 U.C. Davis L. Rev. 1389, 1404 (2020).